**STONE CONROY LLC**
REBEKAH R. CONROY
rconroy@stoneconroy.com
25A Hanover Road, Suite 301
Florham Park, New Jersey 07932
Telephone: (973) 400-4181
Facsimile: (973) 498-0070

**ROBINS KAPLAN LLP**
RAYNA E. KESSLER
NJ ID No. 031782010
399 Park Ave., Suite 3600
New York, NY 10022
Telephone: (212) 980-7431
Facsimile: (212) 980-7499

RONALD J. SCHUTZ (MN 0130849) (admitted pro hac vice)
PATRICK M. ARENZ (MN 0386537) (admitted pro hac vice)
SHARON E. ROBERG-PEREZ (MN 0348272) (admitted pro hac vice)
MARY PHENG (MN 0398500) (admitted pro hac vice)
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181

**United States District Court**
**For the District of New Jersey**

| | |
|---|---|
| PUGET BIOVENTURES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> STRYKER CORPORATION and HOWMEDICA OSTEONICS CORP. (d/b/a STRYKER ORTHOPAEDICS), <br><br> Defendants. | Civil Action No. 2:17-cv-4703-MCA-LDW <br><br> **PLAINTIFF PUGET BIOVENTURES, LLC'S OPENING MARKMAN BRIEF AND APPENDICES** |

# Table of Contents

I.    INTRODUCTION ...................................................................................... 1

II.   BACKGROUND ....................................................................................... 2

   A.   Anatomy of the knee and total knee arthroplasty procedures in the prior art ........................................................................................................... 2

   B.   The '822 patent and Stryker's willful infringement ............................ 4

III.  CLAIM CONSTRUCTION LEGAL STANDARD ..................................... 7

IV.   LEVEL OF ORDINARY SKILL IN THE ART .......................................... 9

V.    ARGUMENT ........................................................................................... 10

   A.   Construction of disputed limitations ................................................. 10

      1.   "A method for a total knee arthroplasty procedure" (preambles of claims 1, 3, 4, 14) ............................................................................... 10

      2.   "adjacent one of a medial portion or a lateral portion" (claims 1, 2)...... 14

      3.   "cutting the end of the one of the femur or the tibia by plunging the saw blade through the slot to create at least a portion of at least one resected surface across both the medial portion and the lateral portion of the one of the femur or the tibia" (claims 1, 2) ....................................................... 20

           ". . . cutting bone to form a cut surface which extends across the end portion of the one long bone a maximum of a second distance in a generally mediolateral direction parallel to a longitudinal central axis of the guide surface which is more than half again as long as the first distance of the cutting guide between the opposite medial and lateral ends" (claims 5, 6) ....................................................................................... 20

           "cutting the end of the long bone by supporting a portion of the saw blade only on a portion of the oscillating saw blade guide surface located generally adjacent the medial half of the long bone while the distal end of the saw blade is extended across the end of the long bone to create at least a portion of at least one resected surface on at least a portion of a lateral half of the long bone without any portion of the oscillating saw blade guide surface being located generally adjacent a lateral side of the long bone for supporting the saw blade while the distal end of the saw blade is extended across the end of the long bone (14, 15) .................... 20

4.  "A method for performing a total knee arthroplasty procedure on a knee joint in a patient's body . . . " (claim 5)/ "A method for providing instrumentation, implants and information for a total knee arthroplasty procedure on a knee joint in a patient's body . . . " (claim 6) .................. 23

B.  Stryker cannot prove by clear and convincing evidence that the '822 patent claims fail to inform one of skill in the art about the scope of the invention with reasonable certainty. .................................................................................. 28

1.  "generally adjacent to a medial half of the long bone" (claims 14, 15) .. 30

2.  "cutting the end of the long bone by supporting a portion of the saw blade only on a portion of the oscillating saw blade guide surface located generally adjacent the medial half of the long bone while the distal end of the saw blade is extended across the end of the long bone to create at least a portion of at least one resected surface on at least a portion of a lateral half of the long bone without any portion of the oscillating saw blade guide surface being located generally adjacent a lateral side of the long bone for supporting the saw blade while the distal end of the saw blade is extended across the end of the long bone" (claims 14, 15) ....... 30

3.  "the slot extending to less than about one half of a mediolateral width of a surface to be resected across the end of the one of the femur or the tibia" (claims 1, 2) ...................................................................................... 33

4.  ". . . cutting bone to form a cut surface which extends across the end portion of the one long bone a maximum of a second distance in a generally mediolateral direction parallel to a longitudinal central axis of the guide surface which is more than half again as long as the first distance of the cutting guide between the opposite medial and lateral ends (claims 5, 6) ........................................................................................ 34

5.  "the cutting guide having opposite medial and lateral ends which are spaced apart by a first distance" (claims 5, 6) ............................................ 35

6.  "a generally J-shaped configuration" (claims 24, 27) ............................... 36

7.  "the cutting guide is positioned to mitigate interference with a patella tendon, a patella, or a quadriceps tendon" (claim 25).............................. 38

C.  Stryker's written description theory should be rejected. ............................... 39

VI.  CONCLUSION........................................................................................... 40

# Table of Authorities

## Cases

*3-D Matrix, Inc. v. Menicon Co.*, Civil Action No. 14-cv-10205-IT, 2016 U.S. Dist. LEXIS 3096 (D. Mass. Jan. 11, 2016) ......................................................................... 28

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318 (Fed. Cir. 2013) ................ 19

*Accordant Energy, LLC v. Vexor Tech., Inc.*, No. 1:17 CV 411, 2017 U.S. Dist. LEXIS 192603 (N.D. Ohio Nov. 21, 2017) ............................................................... 35

*Alpex Comput. Corp. v. Nintendo Co.*, 102 F.3d 1214 (Fed. Cir. 1996) .............................. 8

*Andrew Corp. v. Gabriel Elecs., Inc.*, 847 F.2d 819 (Fed. Cir. 1988) ................................. 32

*Autogiro Co. of Am. v. United States*, 384 F.2d 391 (Ct. Cl. 1967) ................................. 8, 26

*Biomet Orthopedics, LLC v. Puget Bioventures, LLC*, 640 F. App'x 868 (Fed. Cir. 2016) ................................................................................................. 6, 13, 22

*Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374 (Fed. Cir. 2015) ..................... 28, 32

*Cipher Pharm. Inc. v. Actavis Labs. FL, Inc.*, 99 F. Supp. 3d 508 (D.N.J. 2015) .............. 36

*CSB-Sys. Int'l v. Sap Am., Inc.*, No. 10-2156, 2011 U.S. Dist. LEXIS 83462 (E.D. Pa. July 27, 2011) ......................................................................................................... 29

*Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322 (Fed. Cir. 2009) ............................ 8

*Exergen Corp. v. Brooklands, Inc.*, No. 12-12243-DPW, 2014 U.S. Dist. LEXIS 113736 (D. Mass. Aug. 15, 2014) ............................................................................... 40, 43

*Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010) .............................. 9

*IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109 (Fed. Cir. 2011) .......................................... 8

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050 (Fed. Cir. 1989) ..................... 17, 38

*K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356 (Fed. Cir. 1999) ................................................. 7

*Kaneka Corp. v. JBS Hair, Inc.*, No. 3:10-cv-01430-P, 2012 U.S. Dist. LEXIS 157044 (N.D. Tex. Oct. 31, 2012) ............................................................................. 29

*Kumar v. Ovonic Battery Co.*, 351 F.3d 1364 (Fed. Cir. 2003) ....................................... 8, 26

*Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326 (Fed. Cir. 2001) .................. 15

*Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352 (Fed. Cir. 2011)...................... 8

*Mannatech, Inc. v. Techmedica Health, Inc.*, No. 3-06-CV-0813-P, 2009 U.S. Dist. LEXIS 101480 (N.D. Tex. Aug. 28, 2009) ................................................................. 29

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995).............................7, 8

*Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111 (Fed. Cir. 2016) ................... 7, 18

*Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005) ........................ 24

*Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367 (Fed. Cir. 2008)12

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014)........................................... 28

*Neurovision Med. Prods. v. Medtronic Pub. Ltd. Co.*, No. 2:16-cv-127-JRG-RSP, 2016 U.S. Dist. LEXIS 148806 (E.D. Tex. Oct. 27, 2016) ...................................................31, 32

*NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005)............................. 22

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008) ...... 9, 39

*On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133 (Fed. Cir. 2004) ........................................................................................................................... 19

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..........................7, 8, 21

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999) ........................ 10

*Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303 (Fed. Cir. 2004) .................. 10

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001) ........................................ 12

*Rowe v. Dror*, 112 F.3d 473 (Fed. Cir. 1997)................................................................10, 11

*Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283 (Fed. Cir. 2015)............................... 9

*Takeda Pharm. Co. v. Handa Pharm., LLC*, No. C-11-00840 JCS, 2012 U.S. Dist. LEXIS 51013 (N.D. Cal. Apr. 11, 2012)................................................................................. 29

*Takeda Pharm. Co. v. Zydus Pharm. USA, Inc.*, 743 F.3d 1359 (Fed. Cir. 2014).............. 28

*U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554 (Fed. Cir. 1997)..........................1, 9, 39

*Ventana Med. Sys. v. BioGenex Labs., Inc.*, 473 F.3d 1173 (Fed. Cir. 2006) ...................... 21

*Verve v. Crane Cams*, 311 F.3d 1116 (Fed. Cir. 2002) .......................................................... 32

*Vitronics Corp. v. Conceptronic*, 90 F.3d 1576 (Fed. Cir. 1996)........................................ 8, 26

*Waddington N. Am., Inc. v. Sabert Corp.*, Civil Action No. 09-4883 (GEB), 2010 U.S. Dist. LEXIS 114615 (D.N.J. Oct. 27, 2010) ................................................................. 29

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365 (Fed. Cir. 2015) ...................... 31

*WBIP, LLC v. Kohler Co.*, 829 F.3d 1317 (Fed. Cir. 2016) ...................................39, 40, 43

**Statutes**

35 U.S.C. § 112........................................................................................................ 28

35 U.S.C. § 282........................................................................................................ 36

## I.    INTRODUCTION

Plaintiff Puget BioVentures, LLC, submits this opening brief in support of its positions about the construction of disputed limitations in U.S. Patent No. 7,967,822 (the '822 patent),[1] which claims methods for minimally invasive total knee arthroplasty. PugetBV and Defendants, "Stryker," have taken fundamentally different approaches to claim construction. PugetBV's proposed constructions recognize that the purpose of claim construction is to resolve disputes about the meaning—or definitions—of claim terms. Even then, claims should be construed only when it is necessary to do so, because the *Markman* process is "not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). PugetBV has proposed constructions for discrete claim terms that will aid the jury when it deliberates. For example, some terms identified for construction describe knee anatomy, such as "medial portion." As explained below, a "medial portion" of a knee is a part of the knee that is nearer to the median (or midsagittal plane) of the body. Such a construction will help the jury.

By contrast, Stryker does not propose constructions for discrete claim terms. Instead, Stryker has chosen, in some instances, to simply restate the claim language, which would be unhelpful to a jury. In other instances, it proposes a rewrite of a claim limitation, which is legally improper. Stryker also argues that claim terms render '822

---

[1] All cited exhibits are attached to the co-filed Declaration of Rebekah R. Conroy. The patent-in-suit, U.S. Patent No. 7,967,822, is Exhibit 1.

patent claims indefinite, which they do not. Indefiniteness is an invalidity defense on which Stryker bears the burden of proof by clear and convincing evidence. Stryker cannot meet its burden, even if the Court were inclined to take up these issues now.

## II.    BACKGROUND

### A.    Anatomy of the knee and total knee arthroplasty procedures in the prior art

The knee is a joint that includes three bones: the femur, the tibia, and the patella. The femur sits above the tibia, and the patella covers and protects the front of the joint. A fibrous cartilage forms a structure called the meniscus, which is located on the top of the tibia and functions as a shock absorber. Ligaments and tendons connect the bones to one another and to the quadriceps and hamstring muscles.



The part of the knee that is closest to the other knee is called "medial," while the part of the knee that is farthest away from the other knee is called "lateral." The front of the knee is called "anterior," and the back of the knee is called "posterior."



Total knee replacement surgery—or "total knee arthroplasty" (TKA)—is a common procedure in the United States that addresses pain or functional disability attributable to injury or to disease (such as osteoarthritis). As of 2014, more than 2 percent of the U.S. population—or 6.7 million people—had undergone a total knee arthroplasty procedure. Ex. 2. During a conventional TKA procedure, the surgeon first makes a long cut down the middle of the front of the knee, and damaged regions at the ends of the femur and the tibia are cut away (or "resected"). The surgeon then inserts prosthetic components into the knee (below, left).



Before the invention of the '822 patent, cutting guides used during a conventional TKA procedure were bulky, extending across the anterior face of the

3

bone. For example, a tibial cutting guide in the prior art is shown above, on the right. Cutting guide (119) "extends the entire mediolateral width of the bone." Ex. 3 at PBV_Stryker_00082056 ('822 prosecution history, Amendments and Remarks (Dec. 22, 2009) at 27); *see also* Ex. 7 at PBV_Stryker_00116844 ('822 reexamination, Patent Owner's Response to Second Office Action (Feb. 20, 2014) at 13) (describing cutting guide (119) as extending "along *both* the medial and lateral portions of the bone"); Ex. 4 at PBV_Stryker_00205447, 205454-205455 (Bert, Fig. 36, col. 12 ll. 23-27; col. 13 ll. 24-36) (describing slots 123 (yellow) and 122 (red) positioned, respectively, along the medial and lateral portions of the bone).

**B.    The '822 patent and Stryker's willful infringement**

The invention at issue dates back to the mid-1990s. Inventors Tim Haines and David Goldstein conceived of a novel solution to the problems with then-current methods for total knee replacement surgery.[2] The larger prior art cutting guides had to be positioned on both the medial and lateral portions of the knee during a TKA procedure. *Supra*, § II(A). Unlike prior methods, the invention uses a single cutting guide placed on either the medial or lateral portion of the knee to cut both portions of the bone. One embodiment of a cutting guide for use in the invention is shown below in

---

[2] The '822 patent issued on June 28, 2011, and claims priority to an application filed on June 7, 1995. Ex. 1 at PBV_Stryker_00166130 (referring to application 08/479,363, which issued as U.S. Patent No. 5,643,272). PugetBV now owns a portfolio of 23 patents based on the work of Haines and Goldstein, including a related patent, U.S. Patent No. 7,344,541 ("the '541 patent").

Figure 18 of the '822 patent. A single cutting guide (350) is placed proximate the end of a tibia, with a portion of the cutting guide slot facing *one* of a medial or lateral portion of the tibia. Below, on the left, a medial portion of a left tibia is shaded yellow, and a lateral portion is shaded red.



| '822 patent | Accused Stryker technology |
|---|---|

Stryker has been aware of PugetBV's patent enforcement and licensing efforts against Stryker competitors for the last decade. Ex. 5 at 3. PugetBV's predecessor, Hudson Surgical Design, Inc., first enforced a parent patent to the '822 patent against Zimmer, a Stryker competitor. That case was favorably resolved in 2009.[3] Hudson Surgical also licensed its patent portfolio to Smith & Nephew, and then sued Biomet and DePuy in 2010. Each of those companies started a separate, contested *inter partes* reexamination proceeding at the Patent Office. Biomet challenged the validity of the '541 patent, while DePuy attacked the validity of the '822 patent. After years of Patent

---

[3] *Hudson Surgical Design, Inc. v. Zimmer Holdings, Inc., et al.*, No. 08-cv-1566 (N.D. Ill. filed Mar. 18, 2008), D.I. 136-2 (Sept. 16, 2009), in which the '541 patent was enforced.

Office litigation, the Federal Circuit affirmed a key decision by the Patent Trial and Appeal Board ("PTAB"). Claims of the '541 patent are valid over the prior art because they "require using a single cutting guide placed on one side of a bone to cut all the way across the bone without requiring a second cut from the other side (although some free-hand grinding or polishing to smooth any rough spots may be permissible.)" *Biomet Orthopedics, LLC v. Puget Bioventures, LLC*, 640 F. App'x 868, 870 (Fed. Cir. 2016). The PTAB agreed that such a construction applies equally to the '822 patent claims asserted in this case. Ex. 7 at PBV_Stryker_00118719-721 ('822 reexamination, Decision on Appeal (Dec. 16, 2016) at 4-6); PBV_Stryker_00118807-810 ('822 reexamination, Decision on Request for Rehearing (June 26, 2017)). Neither Biomet nor DePuy was successful in their efforts to invalidate the claims that PugetBV ultimately asserted against them. As PugetBV and DePuy resolved their dispute this past January,[4] Biomet and Stryker remain the only major orthopedic manufacturers that have chosen not to license PugetBV's robust patent portfolio.

In this case, PugetBV accuses certain Stryker TKA instrumentation and knee systems of infringement.[5] Stryker has known about the '822 patent since shortly after it

---

[4] Although DePuy at first appealed the results of the reexamination of the '822 patent to the Federal Circuit, that appeal has been dismissed and the Federal Circuit issued its mandate in January. Ex. 7 at 77-78 (Fed. Cir. Order Dismissing Appeal (Jan. 25, 2018)). Both parties anticipate that the Patent Office will issue a reexamination certificate confirming the patentability of the asserted claims shortly. D.I. 55.
[5] PugetBV asserts claims 1, 2, 5, 6, 14, 15, 24, 25, 26, and/or 27, including, for example, against Stryker's MIS Captured Surgical Technique Instruments with Stryker's Triathlon Total Knee System. Ex. 6.

issued in July 2011, D.I. 1, ¶ 42, and chose to infringe through the life of the patent. An example of an infringing tibial cutting guide positioned against a right knee is show above, on the right. Unlike conventional TKA methods, and as the PTAB has confirmed, the '822 patent claims inventive methods for "positioning a cutting guide only on one side of the bone and cutting through the guide on both the medial and lateral sides of the bone to create a resected surface." Ex. 7 at PBV_Stryker_00118721 ('822 reexamination, Decision on Appeal (Dec. 16, 2016) at 6).

## III.   CLAIM CONSTRUCTION LEGAL STANDARD

Claim construction is a question of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). It begins with the claim language, because the claims "define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation omitted). "Courts do not rewrite claims; instead, [courts] give effect to the terms chosen by the patentee." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999). To give effect to the claim terms, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1118 (Fed. Cir. 2016) (citation omitted). Sometimes the "ordinary meaning" of a claim term—as understood by those skilled in the art—"may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. That said, a disputed limitation must be "construed in the context of the claim in

which it appears." *IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1117 (Fed. Cir. 2011); *see also Phillips*, 415 F.3d at 1314. And claim construction should not occur "in a vacuum" but "be harmonized, to the extent possible, with the intrinsic record, as understood within the technological field of the invention." *Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011). Thus, it is proper to consider both the patent specification as well as the prosecution history. *Phillips*, 415 F.3d at 1312-1313, 1317; *Markman*, 52 F.3d at 980.

The prosecution history is instructive because it "provides evidence of how the [Patent Office] and the inventor understood the patent."[6] *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1327 (Fed. Cir. 2009) (citation omitted); *see also Phillips*, 415 F.3d at 1317. It "is relevant not only for purposes of prosecution history estoppel but also for construing the meaning and scope of the claims." *Alpex Comput. Corp. v. Nintendo Co.*, 102 F.3d 1214, 1220 (Fed. Cir. 1996). "Included within an analysis of the file history may be an examination of the prior art cited therein." *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *see also Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003) ("[P]rior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence."); *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 399 (Ct. Cl. 1967) ("In its broader use as source material, the prior art cited in the file wrapper gives clues as to what the claims do not cover.").

---

[6] Copies of the entirety of the certified prosecution history and reexamination history are submitted as Exhibits 30 and 31.

It is also important to recognize what claim construction is *not*. Claim construction is "not an obligatory exercise in redundancy." *U.S. Surgical Corp.*, 103 F.3d at 1568. "[D]istrict courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). As a result, when a party tries to import limitations into a claim, in the guise of offering a construction, a court may resolve the dispute by rejecting the proposal without further construction. *See, e.g., Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction . . . ."); *see also Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) (rejecting Samsung's argument and finding that "[b]ecause the plain and ordinary meaning of the disputed claim language is clear, the district court did not err by declining to construe the claim term").

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art on the subject matter of the '822 patent is one who has education, training, and/or experience in the design and use of surgical techniques and instruments for total knee joint replacement. Typically, these individuals have degrees in engineering or an equivalent discipline with training and/or experience in the design and use of joint replacement techniques and instruments, or will have medical or biomedical training in the area of joint replacement (such as, but not limited to, a medical doctor who specializes in joint replacement).

## V.    ARGUMENT

PugetBV asserts 10 claims against Stryker.[7] There are 12 disputed limitations. PugetBV will first address the limitations for which the parties propose competing constructions. *Infra*, § V(A). PugetBV will next address the limitations that Stryker erroneously contends render the '822 patent claims indefinite. *Infra*, § V(B). PugetBV will conclude by explaining why a Stryker theory related to written description fails or, at the very least, is not an issue for *Markman*. *Infra*, § V(C).

### A.    Construction of disputed limitations

### 1.    "A method for a total knee arthroplasty procedure" (preambles of claims 1, 3, 4, 14)

| *PugetBV's Proposed Construction* | *Stryker's Proposed Construction* |
|---|---|
| The preambles of claims 1, 3, 4, and 14 are limiting. The claims are directed to methods for total knee arthroplasty. | The preambles of claims 1 and 14 are not limiting. The preambles of claims 3 and 4 need no construction. |

A preamble is limiting when it "recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1309 (Fed. Cir. 2004) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)). "Where a patentee uses the claim preamble to recite structural limitations of his claimed invention, the PTO and courts give effect to that usage." *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997). The

---

[7] The Asserted Claims are set forth in full in Appendix I. The parties' proposed constructions of disputed limitations are set forth in D.I. 56, Exhibit 1.

preambles of claims 1 and 14 do not recite a method for any type of an arthroplasty procedure; instead, they recite a method for a "total knee" arthroplasty procedure. This "total knee" limitation must be given effect. *See id.* (claim preamble that defined claim as relating to "balloon angioplasty catheter" limited claimed invention to angioplasty catheters and not to general purpose catheters). The "total knee" limitation informs one of ordinary skill in the art regarding the extent to which the femur or the tibia should be cut. While the bodies of the claims recite that *both* the medial and lateral portions of the bone should be resected, it is not sufficient to resect all of the medial half of the bone and simply pass across the centerline to the lateral half of the bone with the tip of the sawblade. Instead, enough of the bone must be cut so that a "total knee arthroplasty" can be performed.[8]

　　If the preamble is *not* limiting, the claims are read without regard for their context, and they lose meaning. Each of claims 1, 3, 4, and 14, for example, recites a step for

---

[8] PugetBV's position is the same for claims 3 and 4, each of which includes steps in the body of the claim that recite cutting the end of a long bone to create at least a portion of a resected surface. Ex. 1, col. 34 ll. 62-66; col. 35 ll. 28-34. The preambles of claims 3 and 4 also instruct that the cutting must be sufficient for a "total knee arthroplasty procedure." *Id.* at col. 34 l. 44; col. 35 l. 4.

Stryker has not and will not offer constructions for claims 3 and 4. D.I. 56, at 6. It does not believe that any claims that emerge from the reexamination can depend from claims 3 or 4. D.I. 52. But a reexamination certificate will issue and confirm that certain valid dependent claims may depend from claims 3 and 4, even if claims 3 and 4 are not valid. D.I. 55. Having refused to engage in the *Markman* process for claims 3 and 4, Stryker will be precluded from offering constructions at any later date. D.I. 30, ¶¶ 10, 12, 23; L. Pat. R. 4.2, 4.3; Fed. R. Civ. P. 37.

"implanting a total knee arthroplasty implant." Ex. 1, col. 34 ll. 18-19; col. 35 ll. 1, 35; col. 38 l. 5. Each claim also directs resection of both the medial and lateral portions of the knee. *Id.* at col. 34 ll. 13-17, 62-67; col. 35 ll. 28-34; col. 37 l. 60-col. 38 l. 4. If the preamble were not limiting, these terms in the claims would not make sense.

Stryker admits that the preambles of claims 2, 5, 6, and 15 are limiting. D.I. 56, at 2. Those preambles limit the claims to methods related to "total knee arthroplasty." The preambles of claims 1 and 14 should be limiting, too. *See Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (agreeing that "a single 'claim term should be construed consistently with its appearance in other places in the same claim *or in other claims of the same patent*'" (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001)) (emphasis added)). The specification confirms that the invention is not directed to just any arthroplasty procedure but to "total knee replacements." Ex. 1, col. 1 ll. 49-52; *and see* col. 2 ll. 53-58 ("[m]any of the specific applications of the method . . . of the present invention described herein apply to total knee replacement"); col. 17 ll. 22-23 (describing that "the entire upper surface of the proximal tibia" is cut); col. 23 ll. 61-64 (disclosing apparatus "for use in connection with preparation of the distal femur in total knee replacement").

The prosecution histories of the '822 patent and a related patent, U.S. Patent No. 7,344,541 ("the '541 patent"), also establish that the invention is directed to a "total knee" arthroplasty procedure. On appeal during a contested, *inter partes* reexamination of the '541 patent—initiated by a Stryker competitor, Biomet—the Federal Circuit

confirmed the validity of certain of the '541 patent claims because they "require using a single cutting guide placed on one side of a bone *to cut all the way across the bone* without requiring a second cut from the other side (although some free-hand grinding or polishing to smooth any rough spots may be permissible)." *Biomet Orthopedics, LLC*, 640 F. App'x at 870 (emphasis added). The PTAB concluded the same during the reexamination of the '822 patent.

When upholding the validity of the asserted claims, the PTAB discussed that claim 1 requires "positioning a cutting guide only on one side of the bone and cutting through the guide on both the medial and lateral sides of the bone," and that claim 14 requires that a "cutting blade be used to cut into the lateral half of the bone while only being guided by a guide from the medial half." Ex. 7 at PBV_Stryker_00118721-118722 ('822 reexamination, Decision on Appeal (Dec. 16, 2016) at 6-7). Specifically, the PTAB acknowledged that—like the claims of the '541 patent—the '822 patent claims require resection "across both the medial and lateral portions of the bone *and is more than simply passing across the centerline from one side to the other.*" *Id.* at PBV_Stryker_00118722 (emphasis added).

Stryker argues that the preambles of claims 1 and 14 are not limiting because it wants to allege that methods related to a *unicompartmental* knee arthroplasty render the claims obvious. They do not. Ex. 9. During a unicompartmental knee arthroplasty procedure, the surgeon removes only a limited section of bone—*either* a lateral portion *or* a medial portion, but not both. But claims 1 and 14 require a resection *across both* the

medial and lateral portions of the bone. Ex. 1, col. 34 ll. 13-17; col. 37 l. 60-col. 38 l. 4 (emphasis added).



Partial knee arthroplasty procedures are not relevant here,[9] and PugetBV's proposed construction that the preambles should limit claims 1, 3, 4, and 14 to "total knee" arthroplasty procedures should be adopted.

### 2. "adjacent one of a medial portion or a lateral portion" (claims 1, 2)

| PugetBV's Proposed Construction | Stryker's Proposed Construction |
|---|---|
| "adjacent only one of a medial portion or a lateral portion"<br><br>To the extent there is any dispute regarding the meaning of the words "medial" or "lateral," "medial" means "nearer to the median or midsagittal plane of the body," and "lateral" means "farther from the median or midsagittal plane of the body." | "only on one side of the midline between the medial and lateral portions" |

---

[9] Unsurprisingly, following resection in preparation for implantation of a unicompartmental knee, only a unicompartmental knee may be implanted. There is no room for the implantation of a "total knee arthroplasty implant," which is also required by claims 1 and 14. Ex. 1, col. 34 ll. 18-19; col. 38 ll. 5-6.

PugetBV's proposed construction reflects the plain meaning of the claim language. The claims distinguish between positioning the guide on "*one of* a medial portion *or* a lateral portion" and using the guide to cut resected surfaces on "*both* the medial portion *and* lateral portion" of the knee. Ex. 1, *compare* col. 34 ll. 5-7, 35-37 *with* col. 34 ll. 13-17, 38-41. The patentee chose to use the disjunctive—"or"—when describing guide positioning. The claim limitation means what it says: placing the guide "adjacent" to "*only one*" of a medial portion "or" a lateral portion of the bone. *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1330 (Fed. Cir. 2001) (affirming a district court's construction of the term "or" to mean "a choice between either one of two alternatives, but not both," as distinct from the term "and").

The specification supports PugetBV's proposed construction. Figure 18 of the '822 patent discloses a cutting guide placed on only one of a medial portion or a lateral portion of the knee. *Supra*, § II(B) and Ex. 1, Fig. 18; *see generally* Ex. 1, col. 19 ll. 28-46 (discussing a single cutting guide embodiment for use when the patellar tendon, patella, or quad tendon interfere with placement of other guides); Ex. 10 at PBV_Stryker_00022135 (the '541 patent, incorporated by reference into the '822 patent,[10] describing a method that uses a "single medially or laterally located guidance device").

---

[10] Ex. 1, col. 1 ll. 6-8, 28-29.

The prosecution history also supports PugetBV's construction. In distinguishing its invention over a prior art reference to Bert, the patentee explained that its invention required positioning a cutting guide "*along either* the medial portion or the lateral portion" of the bone. In contrast, Bert's cutting guide extends "along *both* the medial and lateral portions of the bone." Ex. 3 at PBV_Stryker_00082056 ('822 prosecution history, Amendments and Remarks (Dec. 22, 2009) at 27); *and see* Ex. 7 at PBV_Stryker_00116844-116845 ('822 reexamination, Patent Owner's Response to Second Office Action (Feb. 20, 2014) at 13) (explaining during reexamination that Bert does not meet the limitations of claims 1 and 2 because the cutting guide of Bert "extends along *both* the medial and lateral portions of the bone" (emphasis in the original)).



| Bert | Guide placement according to the claims | Fig. 18 |
|------|------------------------------------------|---------|

To the extent that the parties dispute the meaning of "medial portion" and "lateral portion," PugetBV proposes constructions that will be helpful to the jury and consistent with the plain and ordinary meaning of the terms. While "medial" means "nearer to the median or midsagittal plane of the body," "lateral" means "farther from the median or midsagittal plane of the body." This definition is consistent with

16

contemporaneous dictionary definitions of the terms "medial" and "lateral," which define those terms to mean "nearer to the medial or midsagittal plane" and "farther from the medial or midsagittal plane," respectively. Ex. 11 at PBV_Stryker_00173174-173175.[11]

Although the parties agree that this limitation means that a guide is placed only on one side of the bone, Stryker's proposed construction rewrites the claim language. Under Stryker's proposed construction, a guide must also be placed "between the medial and lateral portions" of the bone. But courts should not alter what a patent holder has chosen to claim as his invention. *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989). Stryker's construction appears to try to support a non-infringement position based on an (erroneous) prosecution history disclaimer theory. For example, Stryker's Triathlon Knee System infringes the '822 patent. Ex. 6 at 4. As shown below, Stryker's cutting guide is positioned against the medial portion (yellow)—but not the lateral portion (red)—of the tibia:

---

[11] PugetBV's proposed construction is also consistent with the plain and ordinary meaning of the words "portion" and "adjacent." "Adjacent" is ordinarily understood to mean "close to" or "near." Ex. 11 at PBV_Stryker_00231316. And "portion" is ordinarily understood to mean "part or division." *Id.* at PBV_Stryker_00173176.

| Claim limitation | Cutting guide proximate an end of a tibia, adjacent only a medial portion of the tibia |
|---|---|
| positioning a cutting guide in a position proximate an end of one of a femur or a tibia of a knee joint and adjacent one of a medial portion or a lateral portion of the one of the femur or the tibia |  |

In response to PugetBV's infringement contentions, Stryker alleges that the "depicted cutting guides are shown extending across the anterior portion" of the tibia and that plaintiff disclaimed this subject matter. Ex. 12 at 1/18. But for "prosecution disclaimer to attach, the disavowal must be both clear and unmistakable," and if an alleged disavowal is "ambiguous, or even amenable to multiple reasonable interpretations," no disclaimer attaches. *Mass. Inst. of Tech.*, 839 F.3d at 1119 (internal quotation marks and citations omitted). There is no disclaimer that renders the accused Stryker products non-infringing.

Both parties propose constructions that restrict positioning of the guide to only one side of the bone. But Stryker suggests (incorrectly) that PugetBV disclaimed the *way* the accused guides are positioned. To the extent that Stryker's argument is understandable, its proposed theory would apply equally to the accused guides and to the preferred embodiment disclosed in Figure 18 of the '822 patent. A claim construction "that excludes a preferred embodiment from the scope of the claim is

rarely, if ever, correct." *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013) (quoting *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004)).

| *Fig. 18* | *Accused Stryker cutting guide* |
|---|---|
|  | |

To support its disclaimer theory, Stryker cites PugetBV's discussion of prior art during the '822 reexamination. D.I. 56, at Page 16 of 37. But PugetBV nowhere disclaimed claim scope such that the Stryker cutting guides are non-infringing. To the contrary, PugetBV explained to the Examiner why the art cited during the '822 reexamination did not invalidate the patent claims. And that is because—much like Bert, which was distinguished during the original prosecution—all of the prior art references asserted during the reexamination included cutting guides that extended along *both* the medial and lateral portions of the bone. Ex. 7 at PBV_Stryker_00116845 ('822 reexamination, Patent Owner's Response to Second Office Action (Feb. 20, 2014) at 14).[12]

---

[12] *See also* Ex. 13 (Fig. 5); Ex. 14 (Fig. 12).



As PugetBV explained to the Examiner, what PugetBV had in fact "definitively disclaimed" was "any subject matter that extends along *both* the medial and lateral portions of the bone." *Id.* (emphasis added). What PugetBV's claims require is that a cutting guide be positioned along only "*one of* a medial portion or a lateral portion" of the bone. *Id.* at PBV_Stryker_00116844. PugetBV's proposed construction for this limitation should be adopted, and Stryker's proposal rejected.

> 3. **"cutting the end of the one of the femur or the tibia by plunging the saw blade through the slot to create at least a portion of at least one resected surface across both the medial portion and the lateral portion of the one of the femur or the tibia" (claims 1, 2)**
>
> **". . . cutting bone to form a cut surface which extends across the end portion of the one long bone a maximum of a second distance in a generally mediolateral direction parallel to a longitudinal central axis of the guide surface which is more than half again as long as the first distance of the cutting guide between the opposite medial and lateral ends" (claims 5, 6)**
>
> **"cutting the end of the long bone by supporting a portion of the saw blade only on a portion of the oscillating saw blade guide surface located generally adjacent the medial half of the long bone while the distal end of the saw blade is extended across the end of the long bone to create at least a portion of at least one resected surface on**

20

**at least a portion of a lateral half of the long bone without any portion of the oscillating saw blade guide surface being located generally adjacent a lateral side of the long bone for supporting the saw blade while the distal end of the saw blade is extended across the end of the long bone (14, 15)**[13]

| PugetBV's Proposed Construction | Stryker's Proposed Construction |
|---|---|
| "Using a single cutting guide placed on one side of a bone to cut all the way across the bone without requiring a second cut from the other side (although some freehand grinding or polishing to smooth any rough spots may be permissible)." | "cutting the end of the one of the femur or the tibia by plunging the saw blade through the slot to create at least a portion of at least one resected surface across both the medial portion and the lateral portion of the one of the femur or the tibia" |

PugetBV's proposed construction for these limitations is correct because it reflects the teachings of the patent's specification. *Supra*, § (V)(A)(1)-(2). It is also informed by the extensive prosecution histories of both the '822 patent and the related '541 patent. *Id.*; *see Ventana Med. Sys. v. BioGenex Labs., Inc.*, 473 F.3d 1173, 1184 (Fed. Cir. 2006) (explaining that statements made during the prosecution of earlier applications, or during continued prosecution of sibling applications, may "inform the meaning of the claim language by demonstrating how the inventor understood the invention" (quoting *Phillips*, 415 F.3d at 1317)). And claims in related patents that "derive from the same parent application and share many common terms" should be

---

[13] PugetBV's position is that these three limitations should have the same construction. D.I. 56, Exhibit 1, limitation Nos. 5-7. Stryker does not offer a construction for limitation No. 5. It restates the claim language and argues, incorrectly, that limitations Nos. 6 and 7 render the claim indefinite.

construed consistently across patents. *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).

The construction that PugetBV proposes for these limitations is the same construction that the Federal Circuit has already affirmed for similar claims in the related '541 patent. *See Biomet Orthopedics, LLC*, 640 F. App'x at 870. This is the appropriate construction because the PTAB has already determined that the claims of the '822 patent—and specifically claims 1, 2, 5, 6, 14, and 15—are patentable for exactly the same reason as the claims of the '541 patent. Ex. 7 at PBV_Stryker_00118716-118726, PBV_Stryker_00118807-118810 ('822 reexamination, Decision on Appeal (Dec. 16, 2016); Decision on Request for Rehearing (June 26, 2017)).

The PTAB has stated explicitly that "[a]lthough the language in the present claims does not mirror identically the language from [the '541 patent]," each of the independent claims at issue "warrants treatment similar" to that of the '541 claims. *Id.* at PBV_Stryker_00118720-118721 ('822 reexamination, Decision on Appeal (Dec. 16, 2016) at 5-6). For example, because claims 1 and 2 recite a cutting guide with a slot that extends to "less than about one-half of a mediolateral width of a surface to be resected across the end" of the bone and also require "plunging the saw blade through the slot to create at least a portion of at least one resected surface across both the medial portion and the lateral portion of the one of the femur or the tibia," the PTAB understands that these claims "require both positioning a cutting guide only on one side of the bone and cutting through the guide on both the medial and lateral sides of the bone to create a

22

resected surface." *Id.* at PBV_Stryker_00118721. Similarly, the limitation that appears in claims 5 and 6 also "requires cutting using a single guide to create a resected surface across the bone that is a distance more than merely across the centerline from one side to the other." *Id.* at PBV_Stryker_00118722. And claims 14 and 15 also "require that the cutting blade be used to cut into the lateral half of the bone while only being guided by a guide from the medial half." *Id.* PugetBV's proposed construction should be adopted because it aligns best with the PTAB's (and the Federal Circuit's) understanding of the scope of PugetBV's claims.

4. **"A method for performing a total knee arthroplasty procedure on a knee joint in a patient's body . . . " (claim 5)/ "A method for providing instrumentation, implants and information for a total knee arthroplasty procedure on a knee joint in a patient's body . . . " (claim 6)**

| *PugetBV's Proposed Construction* | *Stryker's Proposed Construction* |
|---|---|
| "a minimally invasive total knee arthroplasty procedure" | "A method for performing a total knee arthroplasty procedure on a knee joint in a patient's body comprising . . ." (5) / "A method for providing instrumentation, implants and information for a total knee arthroplasty procedure on a knee joint in a patient's body comprising . . ." (6) |

The parties agree that the preambles of claims 5 and 6 limit these claims to "total knee arthroplasty" procedures. D.I. 56, at 2. Claims 5 and 6 also recite that the knee arthroplasty procedure occur "on a knee joint *in a patient's body*." Ex. 1, col. 35 ll. 37-38, 58-60 (emphasis added). This additional phrase must have meaning. *See Merck & Co. v.*

23

*Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."). Thus, PugetBV asserts that claims 5 and 6 are limited to "minimally invasive" knee arthroplasty procedures—i.e., those that occur *in a patient's body*, as opposed to those that expose the entire joint—which is consistent with the intrinsic record.

The '822 patent teaches that "the ultimate goal of any surgical procedure is to restore the body to normal function," so the quality and orientation of tissue resection is important. Ex. 1, col. 1 ll. 42-48. Placement of cutting guides according to the invention must account for the knee anatomy and avoid unwarranted disruption of the tissue. *Id.* at col. 9 ll. 53-56. To minimize disruption, the patent describes cutting guides positioned *on only one side* of the knee. *Id.* at Fig. 18; col. 19 ll. 28-35 (discussing a single cutting guide embodiment for use when the patellar tendon, patella, or quad tendon interfere with placement of other guides); *see also* Ex. 10 at PBV_Stryker_00022135 (describing a method that uses a "single medially or laterally located guidance device").

The prosecution history also supports PugetBV's proposed construction. During prosecution, PugetBV explained to the Examiner that its invention differed from prior art methods that used bulkier cutting guides that spanned the *entire* mediolateral width of the knee. When these prior art guides were used, surgeons necessarily had to make longer, more invasive incisions. This result is shown below, with arrows indicating the medial (yellow) and lateral (red) parts of the knee when viewed from the knee's anterior face. (Nos. 1-5.)

24



By contrast, the PTAB determined that PugetBV's claims are valid because they require that a cutting guide that is placed only on *one* side of the knee be used to cut *both* sides of the knee. As shown below, in No. 6, a cutting guide of the '822 patent does *not* span the entire mediolateral width of the knee: it is adjacent to only the medial (or lateral) portion of the knee. *See* Ex. 7 at PBV_Stryker_00116844-116845, PBV_Stryker_00116865-116866, PBV_Stryker_00116874 ('822 reexamination, Patent Owner's Response to Second Office Action (Feb. 20, 2014) at 13-14, 34-35, 43); Ex. 3 at PBV_Stryker_00082056 ('822 prosecution history, Amendments and Remarks (Dec. 22, 2009) at 27).[14]

---

[14] *See also* Ex. 4 at PBV_Stryker_00205447 (Bert Fig. 36); Ex. 13 at PBV_Stryker_00223435 (Woolson Fig. 5).



Given the size of the cutting guides used in the cited prior art total knee arthroplasty methods, none of these procedures is "minimally invasive." *See Vitronics Corp.*, 90 F.3d at 1583 (explaining that "[i]ncluded within an analysis of the file history may be an examination of the prior art cited therein"); *Kumar*, 351 F.3d at 1368 ("[P]rior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence."); *Autogiro Co. of Am.*, 384 F.2d at 399 ("In its broader use as source material, the prior art cited in the file wrapper gives clues as to what the claims do not cover.").

Those of ordinary skill in the art understand that a "minimally invasive" total knee arthroplasty procedure is one that involves "a more limited exposure to avoid injuring the surrounding soft tissues" of the knee. Ex. 18 at PBV_Stryker_00173181. *Compare* below, left, *with* below, right:

| Minimal exposure of knee joint, which remains "in a patient's body" | Comparison of incision length during a minimally invasive TKA (left) with a traditional TKA (right) | Maximal exposure of knee joint |
|---|---|---|
| | | |



Although the same type of prosthetic is implanted during a minimally invasive procedure as in a traditional TKA, a smaller incision is made in the knee.[15] Surgeons use specially designed instruments to prepare the femur and tibia to receive the implant. Ex. 19 at PBV_Stryker_00173168. The invention of the '822 patent allows surgeons to make a smaller incision in the knee, and to prepare the knee to receive a total knee arthroplasty procedure, using a smaller cutting guide than was traditionally used. This process achieves the objective of minimizing tissue interference, *see* Ex. 1, col. 40 ll. 5-6, and allows the arthroplasty procedure to be completed on the knee *while it remains within the patient's body.* That is the meaning of the additional phrase "in a patient's body." That is why the preamble means "a minimally invasive total knee arthroplasty

---

[15]     *See*   http://www.northwesternorthopaedicinstitute.com/minimally-invasive.html;
http://www.orthop.washington.edu/?q=patient-care/articles/knee/minimally-
invasive-surgery-mis-quadriceps-sparing-total-knee-replacement.

procedure." Stryker's proposed construction ignores the added phrase. The Court should adopt PugetBV's proposed construction.

### B.    Stryker cannot prove by clear and convincing evidence that the '822 patent claims fail to inform one of skill in the art about the scope of the invention with reasonable certainty.

Stryker cannot establish by any evidence, let alone clear and convincing evidence, that any claim term renders any of the '822 patent claims indefinite. *See Takeda Pharm. Co. v. Zydus Pharm. USA, Inc.*, 743 F.3d 1359, 1366 (Fed. Cir. 2014) (explaining that indefiniteness is an invalidity defense on which the defendant bears the burden of proof by clear and convincing evidence). Patent claims must particularly point out and distinctly claim the invention. 35 U.S.C. § 112. This requirement is satisfied so long as the claims—when read in light of the intrinsic record—inform those skilled in the art "with reasonable certainty" about the scope of the invention. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). Courts recognize that there are "inherent limitations of language" and that the "degree of precision necessary . . . is a function of the nature of the subject matter." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1382 (Fed. Cir. 2015) (citations omitted). In determining whether claims satisfy the definiteness requirement, it is appropriate to consider both a patent's specification and its prosecution history. *Id.* at 1382-83. While indefiniteness is "often 'intimately related'" to claim construction, indefiniteness is a defense that the defendant bears the burden of proving by clear and convincing evidence. *3-D Matrix, Inc. v. Menicon Co.*, Civil Action No. 14-cv-10205-IT, 2016 U.S. Dist. LEXIS 3096, at *40 (D. Mass. Jan. 11, 2016). So

courts do not uniformly address such challenges during *Markman*; instead, many resolve indefiniteness challenges at the summary judgment stage, with the balance of the invalidity issues. *See, e.g., CSB-Sys. Int'l v. Sap Am., Inc.*, No. 10-2156, 2011 U.S. Dist. LEXIS 83462, at *48-55, *62 n.16 (E.D. Pa. July 27, 2011) ("The weight of the jurisprudence disfavors indefiniteness determinations at the *Markman* stage of patent litigation." (collecting cases)).[16]

Stryker alleges that seven limitations render claims of the '822 patent indefinite.[17] As a general matter, each of Stryker's theories relates to the positioning of the cutting guide relative to the bone, and the purported difficulty that one of ordinary skill in the art would encounter in determining whether she was practicing the claims. D.I. 56, at 3-4. Such theories do not render any of the claims indefinite.

---

[16] *See also Kaneka Corp. v. JBS Hair, Inc.*, No. 3:10-cv-01430-P, 2012 U.S. Dist. LEXIS 157044, at *19 (N.D. Tex. Oct. 31, 2012) ("[A] bare indefiniteness assertion fails at [the Markman] stage . . . ."); *Takeda Pharm. Co. v. Handa Pharm., LLC*, No. C-11-00840 JCS, 2012 U.S. Dist. LEXIS 51013, at *47-48 (N.D. Cal. Apr. 11, 2012) (deferring indefiniteness until summary judgment because whether a skilled artisan could determine relevant amounts without undue experimentation was a "largely factual" inquiry); *Waddington N. Am., Inc. v. Sabert Corp.*, Civil Action No. 09-4883 (GEB), 2010 U.S. Dist. LEXIS 114615, at *5-7 (D.N.J. Oct. 27, 2010) ("[P]ractical considerations . . . militate against determining indefiniteness prior to the end of fact or expert discovery."); *Mannatech, Inc. v. Techmedica Health, Inc.*, No. 3-06-CV-0813-P, 2009 U.S. Dist. LEXIS 101480, at *26-27 (N.D. Tex. Aug. 28, 2009).

[17] PugetBV has addressed Stryker's indefiniteness theories in its opening *Markman* brief because they are part of the parties' joint claim construction statement. Because Stryker bears the burden of proof on its invalidity defenses, PugetBV reserves the right to rely on rebuttal expert testimony, to be submitted with its responsive *Markman* brief, about Stryker's indefiniteness theories.

1.    **"<u>generally adjacent</u> to a <u>medial half</u> of the long bone" (claims 14, 15)**

2.    **"cutting the end of the long bone by supporting a portion of the saw blade only on a portion of the oscillating saw blade guide surface located <u>generally adjacent</u> the <u>medial half</u> of the long bone while the distal end of the saw blade is extended across the end of the long bone to create at least a portion of at least one resected surface on at least a portion of a lateral half of the long bone without any portion of the oscillating saw blade guide surface being located generally adjacent a lateral side of the long bone for supporting the saw blade while the distal end of the saw blade is extended across the end of the long bone" (claims 14, 15)**

According to Stryker, one of ordinary skill in the art would not understand where the "medial half" of the long bone is, or what it means to be "generally adjacent" to the "medial half" of the bone. D.I. 56, at 3. But one of ordinary skill in the art understands what the terms "medial" and "lateral" mean, for the reasons discussed above. *Supra*, § V(A)(2). There is nothing in the intrinsic record that suggests that "half" means anything but its customary and ordinary meaning, which is "either of two equal parts into which a thing is divisible." Ex. 11 at PBV_Stryker_00173189. Similarly, the terms "generally" and "adjacent" should also have their ordinary and customary meanings of, respectively, "for the most part" and "close to" or "near." Ex. 11 at PBV_Stryker_00231316-231317. Indeed, Figure 18 of the patent depicts precisely what is claimed in claims 14 and 15: a cutting guide that is positioned with a bone contacting surface "generally adjacent to a medial half of the long bone." Ex. 1, col. 37 ll. 52-59; col. 38 ll. 20-23. And PugetBV repeatedly explained to the Patent Office that its

invention differed from the prior art because—unlike the art—the invention requires a cutting guide that extends along *one* of the medial or lateral portions of the bone. *Supra*, § V(A)(2), (3).

Courts have repeatedly rejected similar indefiniteness theories that are based on limitations relative to a patient's anatomy. In a case about spinal implants, for example, the claimed implant needed to have "a length that is greater than one half the transverse width of the vertebrae." *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1370 (Fed. Cir. 2015). The infringer argued—to no avail—that it would not "know whether an implant infringes until it is selected for a particular patient." *Id.* The claims were affirmed as valid. "The relative nature of the claim does not itself make it indefinite," and the infringer had not shown, by clear and convincing evidence, that "human anatomy varies so significantly that reliance on the well-known dimensions of human vertebrae makes the claims indefinite." *Id.* at 1371. Likewise, in a case involving technology for monitoring electrical signals during a laryngeal electromyography, an accused infringer argued that method claims were indefinite because they required electrode plates "positioned to contact" either the vocal cords or the tongue. *Neurovision Med. Prods. v. Medtronic Pub. Ltd. Co.*, No. 2:16-cv-127-JRG-RSP, 2016 U.S. Dist. LEXIS 148806, at *3, *6-7, *31 (E.D. Tex. Oct. 27, 2016). Because the "'positioned to contact' terms [were] defined with reference to anatomy that is inherently variable," defendants argued that there was "no way to determine whether a particular configuration of electrodes are positioned according to the claims." *Id.* at *31. They were unsuccessful.

31

As the court observed, the Federal Circuit had earlier determined claims were *not* indefinite when they recited electrodes in "spaced relationship" with each other. *Id.* at *36 (citing *Biosig Instruments, Inc.*, 783 F.3d at 1382-83). Because the electrodes were used to collect electrical signals from a user's hand, the term "spaced relationship" was implicitly defined, in part, by "the width of a user's hands." *Id.* at *37. Likewise, in *Neurovision*, it was not meaningfully different *to define electrode positioning* by the "locations of a patient's vocal cords, tongue, and trachea." *Id.* The claims were valid.

The same logic that applied in *Biosig*, *Warsaw Orthopedic*, and *Neurovision* applies here. Claims 14 and 15 recite the positioning of a guide relative to the "medial half" of a bone. There is nothing to suggest that one of ordinary skill in the art cannot determine where that is. Nor does the use of the word "generally" render the claims indefinite. Terms of degree are routinely used in medical device patent claims. *See, e.g.*, Ex. 20, col. 8 l. 66-col. 9. l. 1; col. 10 ll. 8-10 (claiming an ostomy cartridge with a "generally cylindrical body"); Ex. 21, col. 14 ll. 33-45 (claiming a wound-healing fastener with mesh "having a generally triangular configuration"); *and see Verve v. Crane Cams*, 311 F.3d 1116, 1120 (Fed. Cir. 2002) (explaining that terms of degree may be used "to describe the invention with precision appropriate to the technology"); *Andrew Corp. v. Gabriel Elecs., Inc.*, 847 F.2d 819, 821-22 (Fed. Cir. 1988) (noting that terms such as "approach each other," "close to," "substantially equal," and "closely approximate" are ubiquitously used in patent claims and routinely upheld by the courts). As a result, neither of the limitations identified in §§ V(B)(1) or V(B)(2) render claims 14 or 15 of the '822 patent

indefinite. Indeed, DePuy (a Stryker competitor) understood these claims with reasonable certainty, evident in its ability to set forth multiple, though ultimately failed, theories as to why they were invalid in view of the prior art. Ex. 7 at PBV_Stryker_00093830-93844 ('822 reexamination, Petition for *Inter Partes* Reexamination Table of Contents). And the Patent Office was able to determine that the prior art did not disclose these claims. Ex. 7 at PBV_Stryker_00118716-118726, PBV_Stryker_00118807-118810 ('822 reexamination, Decision on Appeal (Dec. 16, 2016); Decision on Request for Rehearing (June 26, 2017)).

> **3.    "the slot extending to less than about one half of a mediolateral width of a surface to be resected across the end of the one of the femur or the tibia" (claims 1, 2)**

Stryker's position is that one of ordinary skill in the art would not understand what a "mediolateral width" means or how that should be identified "on the anterior face of the femur or tibia." D.I. 56, at 3-4. Stryker's first mistake is to assume that a "mediolateral width" should be measured on the "anterior face" of the bone. This assumption is not what the claims require. Claims 1 and 2 require an assessment of the "mediolateral width *of a surface to be resected*" (emphasis added). Measuring only across the anterior face misses the point. The "surface to be resected" is not a line drawn across the "anterior face" of the bone, but a plane. This conclusion is consistent with the structure of claims 1 and 2, which also recite that the "surface to be resected" includes both medial and lateral portions of the bone, and that the resection be carried

out before the final step in the claim of "implanting a total knee arthroplasty implant."

This conclusion is also consistent with the embodiment disclosed in Figure 18.



| *Accused Stryker technology* | *"surface to be resected"* | *Accused Stryker technology* |
|---|---|---|

The use of the word "about" in the claims also does not render them indefinite. *Supra*, § V(B)(1). In fact, Stryker has used the term "about" repeatedly in its own claims relating to implanting methods. Ex. 22, claims 8, 14 (claiming methods of implanting an intramedullary nail, reciting, for example, a radius of curvature for the nail that is "about" 2500 mm, or where the nail is rotated "about" 24°). And both DePuy and the Patent Office understood the scope of these claims during the reexamination, which determined that claims 1 and 2 were valid over the prior art. Ex. 7 at PBV_Stryker_00118716-118726, PBV_Stryker_00118807-118810 ('822 reexamination, Decision on Appeal (Dec. 16, 2016); Decision on Request for Rehearing (June 26, 2017)).

4.   **". . . cutting bone to form a cut surface which extends across the end portion of the one long bone a maximum of a second distance in a generally mediolateral direction parallel to a longitudinal central axis of the guide surface which is more than half again as**

       **long as the first distance of the cutting guide between the opposite medial and lateral ends (claims 5, 6)**

    **5.**    **"the cutting guide having opposite medial and lateral ends which are spaced apart by a first distance" (claims 5, 6)**

Stryker's theory is that one of ordinary skill in the art would not be able to determine what the "longitudinal central axis" of the guide surface is for non-linear guides, presumably such as those that are generally "L-shaped" or "J-shaped." D.I. 56, at 4. Nor, according to Stryker, would one be able to determine what the "second distance" is according to the claims. To begin with, the claimed "second" distance does not depend on the shape of the cutting guide. Instead, the "second distance" is the distance across the "cut surface" of the bone, which is understandable to a reasonable certainty for the reasons set forth above. *Supra*, § V(B)(3). Stryker also takes issue with measuring the claimed "first distance," determined by measuring the distance between the "opposite medial and lateral ends" of the guide. But this measurement does not occur in a vacuum. Rather, a "first distance" is one that is readily apparent to one of ordinary skill in the art once the guide is positioned "generally adjacent to a medial half" of the bone. *See, e.g.*, Ex. 6 at 28-35. In addition, claims 5 and 6 nowhere require the use of a "non-linear guide," such as one that is generally "L-shaped" or "J-shaped." It should go without saying that a claim cannot be indefinite based on a limitation that it does not even include. *See, e.g.*, *Accordant Energy, LLC v. Vexor Tech., Inc.*, No. 1:17 CV 411, 2017 U.S. Dist. LEXIS 192603, at *11-12 (N.D. Ohio Nov. 21, 2017) ("[D]efendant is improperly attempting to read into the patent a limitation that is not

present in the patent itself. There is simply no indication that the patentee intended to limit the timing of the measurement. Therefore, the measurement can occur at any point during the described processes. The Court agrees with plaintiff that the issue thus becomes one of infringement rather than indefiniteness."). And indefiniteness is determined on a claim-by-claim basis. 35 U.S.C. § 282 ("Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims . . . ."); *Cipher Pharm. Inc. v. Actavis Labs. FL, Inc.*, 99 F. Supp. 3d 508, 513 (D.N.J. 2015). Those asserted claims that recite a cutting guide that is generally "L-shaped" or "J-shaped" do not depend from claims 5 or 6, and so do not have this limitation.[18]

That claims 5 and 6 are not indefinite is only reinforced by DePuy's ability to understand the scope of these claims with reasonable certainty, identifying certain prior art that it believed was invalidating, and the Patent Office's determination that claims 5 and 6 were nonetheless valid in view of that art. Ex. 7 at PBV_Stryker_00118716-118726, PBV_Stryker_00118807-118810 ('822 reexamination, Decision on Appeal (Dec. 16, 2016); Decision on Request for Rehearing (June 26, 2017)).

### 6.    "a generally J-shaped configuration" (claims 24, 27)

---

[18] Claim 14, cancelled during the reexamination, is a multiply dependent claim, including from claims 5 or 6. Like claims 24 and 27, it recites a cutting guide with a generally L or J shaped configuration. Yet claim 14 also recites exactly where to position each portion of the non-linear guide relative to the knee. And, again, once a guide is positioned, its "opposite" medial and lateral ends can be determined to a reasonable certainty.

Stryker argues that one of ordinary skill in the art would not understand the meaning of a "generally J-shaped configuration." D.I. 56, at 4. But the '822 patent specification discloses "J-shaped" structures. Ex. 1, Figs. 3 and 8.



| *Fig. 3* | *Fig. 8* |
|---|---|

It is also commonplace for medical device companies to claim structures that have well-understood shapes. Indeed, Stryker has written claims with similar language. Ex. 25, claim 15 (claiming a bassinet with an element "having a substantially J-shaped cross section"); Ex. 26, claim 1 (claiming a "U-shaped" fixation ring); Ex. 27, claim 10 (claiming "conically shaped" components of a bone fixation system); Ex. 28, claim 13 (claiming a stent with chevron-shaped segments); Ex. 29, claims 2, 6 (claiming a medical assembly for delivering an implant with components that "have paddle-shaped configurations," or "a hook-like configuration or a C-shaped configuration"). And, again, the validity of claims 24 and 27 is reinforced by DePuy's ability to understand the scope of these claims with reasonable certainty, when it identified certain prior art that it believed was invalidating, and by the Patent Office's determination that claims 24 and 27 were valid. Ex. 7 at PBV_Stryker_00118716-118726, PBV_Stryker_00118807-

118810 ('822 reexamination, Decision on Appeal (Dec. 16, 2016); Decision on Request for Rehearing (June 26, 2017)).

### 7.  "the cutting guide is positioned to mitigate interference with a patella tendon, a patella, or a quadriceps tendon" (claim 25)

Stryker argues that one of ordinary skill in the art would not understand, with reasonable certainty, where a guide should be placed to "mitigate interference with a patella tendon, a patella, or a quadriceps tendon." D.I. 56, at 4. This theory should be rejected for the same reasons that the Court should reject Stryker's indefiniteness theory based on positioning a guide generally adjacent to a medial half of a bone. Claims referring to a patient's anatomy are not indefinite just because there may be some variability, patient to patient. *Supra*, § V(B)(1), (2). Likewise, claims cannot be indefinite simply because there is some variability, patient to patient, in how a guide must be positioned so as to "mitigate interference" with certain parts of a patient's anatomy.

Stryker admits that this term can be construed by proposing that the limitation means "the cutting guide is positioned such that, without moving or cutting any portion of the patella tendon, a patella, or a quadriceps tendon, the cutting guide does not contact or overlay any portion of a patella tendon, a patella, or a quadriceps tendon." D.I. 56, at Page 14 of 37. Even so, Stryker's proposed construction—which rewrites an 18-word phrase into one with 43 words—is a clear effort to change the scope of the claim and should be rejected. *Intervet Am., Inc.*, 887 F.2d at 1053. If this limitation requires construction, it should have its ordinary and customary meaning. "Mitigate"

means "to moderate" or "to become milder." Ex. 11 at PBV_Stryker_00231318. The claims and intrinsic record of the patent make clear exactly how to accomplish this. And that is by "positioning a cutting guide only on one side of the bone and cutting through the guide on both the medial and lateral sides of the bone to create a resected surface." Ex. 7 at PBV_Stryker_00118721 ('822 reexamination, Decision on Appeal (Dec. 16, 2016) at 6). Finally, neither the Patent Office, nor DePuy, had any difficulty in understanding the scope of the asserted claims relative to the prior art that DePuy asserted during the '822 patent reexamination.

The Patent Office has already examined the claims asserted here. In fact, it has determined that they are valid. *Twice*. None of the claims are indefinite.

### C.    Stryker's written description theory should be rejected.

Stryker asserts that the limitation "providing a surgeon with information on a method to perform the total knee arthroplasty procedure" (claims 2, 6, and 15) is invalid for failing to satisfy the written description requirement. Written description is an invalidity defense on which Stryker bears the burden of proof by clear and convincing evidence. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1338 (Fed. Cir. 2016). Stryker cannot meet its burden. This limitation needs no construction because neither the entire phrase, nor any of the individual words within the phrase, is beyond the understanding of the average juror. *O2 Micro Int'l Ltd.*, 521 F.3d at 362 (explaining that courts need not construe every limitation in a claim); *U.S. Surgical Corp.*, 103 F.3d at 1568 (cautioning against the *Markman* process becoming "an obligatory exercise in redundancy"). The

term "providing," for example, simply means supplying or making available. Ex. 11 at PBV_Stryker_00173193. The term is not used any differently within the '822 patent specification. *See, e.g.*, Ex. 1, col. 5 ll. 22-24; col. 6 ll. 9-25. An invalidity defense based on insufficient written description is a fact-intensive inquiry inappropriate for *Markman*, which primarily involves questions of law for the Court. *See WBIP, LLC*, 829 F.3d at 1337; *Exergen Corp. v. Brooklands, Inc.*, No. 12-12243-DPW, 2014 U.S. Dist. LEXIS 113736, at *51 (D. Mass. Aug. 15, 2014) ("[T]he issue[] of written description [is] reserved for summary judgment or trial."). Moreover, as PugetBV explained in its response to Stryker's invalidity contentions, there is ample disclosure in the specification to support this limitation. *See* Ex. 1, col. 2 ll. 34, 37-38, 40-44, 53-58; col. 3 l. 59-col. 4 l. 3; col. 5 l. 37-col. 6 l. 61.

## VI.    CONCLUSION

For the reasons above, PugetBV respectfully requests that the Court reject Stryker's proposed claim constructions and indefiniteness theories and adopt PugetBV's proposed constructions.

Dated:  April 16, 2018

By: */s/ Rebekah R. Conroy*
Rebekah R. Conroy
**STONE CONROY LLC**
rconroy@stoneconroy.com
25A Hanover Road, Suite 301
Florham Park, NJ 07932
(973) 400-4181

**Robins Kaplan LLP**
Ronald J. Schutz (MN #0130849)
(admitted pro hac vice)
Patrick M. Arenz (MN #0386537)
(admitted pro hac vice)
Sharon E. Roberg-Perez (MN #0348272)
(admitted pro hac vice)
Mary Pheng (MN #0398500)
(admitted pro hac vice)
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402
(612) 349-8500
rschutz@robinskaplan.com
parenz@robinskaplan.com
sroberg-perez@robinskaplan.com
mpheng@robinskaplan.com

**Attorneys for Puget BioVentures, LLC**

**Certificate of Service**

I hereby certify that on April 16, 2018, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record and other persons electronically noticed.

April 16, 2018

/s/ Rebekah R. Conroy

**Appendix I: Asserted Claims**

The number of the asserted claims is **bolded**. Limitations for construction are in **bold red font**. Limitations that are the basis of Stryker's indefiniteness theories are shaded. Limitations for which Stryker asserts there is no written description support, with which PugetBV disagrees, are underlined.[19]

| Claims asserted under 35 U.S.C. § 271(a) | Claims asserted under 35 U.S.C. §§ 271(b), (c) |
|---|---|
| **2.** A method for providing instrumentation, implants and information for a total knee arthroplasty procedure comprising: | **1. A method for a total knee arthroplasty procedure** comprising: |
| providing a total knee arthroplasty implant and a cutting guide having a slot adapted to receive and guide an oscillating saw blade, | positioning a cutting guide in a position proximate an end of one of a femur or a tibia of a knee joint and **adjacent one of a medial portion or a lateral portion** of the one of the femur or the tibia, |
| the slot extending to less than about one-half of a mediolateral width of a surface to be resected across an end of one of a femur or a tibia of a knee joint, | the cutting guide including a slot adapted to receive and guide an oscillating saw blade, |
| | the slot extending to less than about one-half of a mediolateral width of a surface to be resected across the end of the one of the femur or the tibia, |
| the oscillating saw blade having at least one cutting edge at a distal end of a long axis of the saw blade; | the oscillating saw blade having at least one cutting edge at a distal end of a long axis of the saw blade; |
| providing a surgeon with information on a method to perform the total knee arthroplasty procedure using the cutting guide, the oscillating saw blade and the total knee arthroplasty implant, the method including: | **cutting the end of the one of the femur or the tibia by plunging the saw blade through the slot to create at least a** |

[19] While the parties have exchanged infringement and invalidity contentions and responses thereto, expert discovery will not be complete until May 16. Written description should be addressed at a later time. *See WBIP, LLC*, 829 F.3d at 1337; *Exergen Corp.*, 2014 U.S. Dist. LEXIS 113736, at *51 ("[T]he issue[] of written description [is] reserved for summary judgment or trial.")

| Claims asserted under 35 U.S.C. § 271(a) | Claims asserted under 35 U.S.C. §§ 271(b), (c) |
|---|---|
| positioning the cutting guide in a position proximate the end of the one of the femur or the tibia and **adjacent one of a medial portion or a lateral portion** of the one of the femur or the tibia;<br><br>**cutting the end of the one of the femur or the tibia by plunging the saw blade through the slot to create at least a portion of at least one resected surface across both the medial portion and the lateral portion of the one of the femur or the tibia**; and<br><br>implanting a total knee arthroplasty implant on the at least one resected surface. | **portion of at least one resected surface across both the medial portion and the lateral portion of the one of the femur or the tibia**; and<br><br>implanting a total knee arthroplasty implant on the at least one resected surface. |
| | |
| 4. **A method** for providing instrumentation, implants and information **for a total knee arthroplasty procedure** comprising:<br><br>providing a total knee arthroplasty implant and a cutting guide having a slot adapted to receive and guide an oscillating saw blade,<br><br>the slot being generally defined in a body extending between a first side and a second side of the cutting guide, wherein the first side of the cutting guide is adapted to be positioned generally adjacent an anterior to posterior extending midline of an end of a long | 3. **A method for a total knee arthroplasty procedure** comprising:<br><br>positioning a cutting guide in a position proximate an end of a long bone of a knee joint, the cutting guide including a slot adapted to receive and guide an oscillating saw blade,<br><br>the slot being generally defined in a body extending between a first side and a second side of the cutting guide, wherein the first side of the cutting guide is adapted to be positioned generally adjacent an anterior to posterior extending midline of the end of the long bone of the knee joint and the slot extends from |

44

| Claims asserted under 35 U.S.C. § 271(a) | Claims asserted under 35 U.S.C. §§ 271(b), (c) |
|---|---|
| bone of a knee joint and the slot extends from proximate the first side in one of a medial or lateral direction toward the second side,<br><br>the oscillating saw blade having at least one cutting edge at a distal end of a long axis of the oscillating saw blade;<br><br>providing a surgeon with information on a method to perform the total knee arthroplasty procedure using the cutting guide, the oscillating saw blade and the total knee arthroplasty implant, the method including:<br><br>positioning the cutting guide in a position proximate the end of the long bone of the knee joint with at least a portion of the slot extending a first distance along a face of the long bone in a mediolateral direction;<br><br>extending the oscillating saw blade through the slot;<br><br>cutting the end of the long bone by moving the oscillating saw blade across the long bone to create at least a portion of at least one resected surface, the resected surface having a maximum mediolateral width extending a second distance, wherein the second distance is more than half again as long as the first distance; and<br><br>implanting the total knee arthroplasty implant on the at least one resected surface. | proximate the first side in one of a medial or lateral direction toward the second side,<br><br>the oscillating saw blade having at least one cutting edge at a distal end of a long axis of the oscillating saw blade<br><br>with at least a portion of the slot extending a first distance along a face of the long bone in a mediolateral direction;<br><br>extending the oscillating saw blade through the slot;<br><br>cutting the end of the long bone by moving the oscillating saw blade across the long bone to create at least a portion of at least one resected surface, the resected surface having a maximum mediolateral width extending a second distance, wherein the second distance is more than half again as long as the first distance; and<br><br>implanting a total knee arthroplasty implant on the at least one resected surface. |

45

| Claims asserted under 35 U.S.C. § 271(a) | Claims asserted under 35 U.S.C. §§ 271(b), (c) |
|---|---|
| | |
| **6. A method for providing instrumentation, implants and information for a total knee arthroplasty procedure on a knee joint in a patient's body** comprising:

providing a total knee arthroplasty implant and a cutting guide having at least one guide surface adapted to guide an oscillating saw blade, the cutting guide having opposite medial and lateral ends which are spaced apart by a first distance;

providing a surgeon with information on a method to perform the total knee arthroplasty procedure using the cutting guide, the oscillating saw blade and the total knee arthroplasty implant, the method including:

positioning the cutting guide on an end portion of one long bone of the knee joint;

moving the oscillating saw blade into engagement with the one long bone at the knee joint;

cutting the one long bone at the knee joint with the oscillating saw blade by moving the oscillating saw blade along the guide surface on the cutting guide and

**cutting bone to form a cut surface which extends across the end portion of the one long bone a maximum of a** | **5. A method for performing a total knee arthroplasty procedure on a knee joint in a patient's body** comprising:

positioning a cutting guide having at least one guide surface adapted to guide an oscillating saw blade proximate an end portion of one long bone of the knee joint, the cutting guide having opposite medial and lateral ends which are spaced apart by a first distance;

moving the oscillating saw blade into engagement with the one long bone at the knee joint;

cutting the one long bone at the knee joint with the oscillating saw blade by moving the oscillating saw blade along the guide surface on the cutting guide and

**cutting bone to form a cut surface which extends across the end portion of the one long bone a maximum of a second distance in a generally mediolateral direction parallel to a longitudinal central axis of the guide surface which is more than half again as long as the first distance of the cutting guide between the opposite medial and lateral ends**; and

positioning a total knee arthroplasty implant into engagement with the cut surface. |

46

| Claims asserted under 35 U.S.C. § 271(a) | Claims asserted under 35 U.S.C. §§ 271(b), (c) |
|---|---|
| **second distance in a generally mediolateral direction parallel to a longitudinal central axis of the guide surface which is more than half again as long as the first distance of the cutting guide between the opposite medial and lateral ends**; and<br><br>positioning a total knee arthroplasty implant into engagement with the cut surface. | |
| | |
| **15.** A method for providing instrumentation, implants and information for a total knee arthroplasty procedure associated with an end of a long bone of a knee joint that is one of a tibia or a femur, the method comprising:<br><br>providing a cutting guide including an oscillating saw blade guide surface configured to receive an oscillating saw blade having at least one cutting edge at a distal end of a long axis of the saw blade and a bone contacting surface; and<br><br>providing a surgeon with information on a method to perform the total knee arthroplasty procedure using the cutting guide, the oscillating saw blade and the total knee arthroplasty implant, the method including:<br><br>positioning the bone contacting surface of the cutting guide in a position proximate the end of the long bone and generally adjacent to a medial half of the long bone, | **14. A method for a total knee arthroplasty procedure** comprising:<br><br>positioning a cutting guide including an oscillating saw blade guide surface configured to receive an oscillating saw blade having at least one cutting edge at a distal end of a long axis of the saw blade and a bone contacting surface such that the bone contacting surface of the cutting guide is in a position proximate an end of a long bone of a knee joint and generally adjacent to a medial half of the long bone,<br><br>**cutting the end of the long bone by supporting a portion of the saw blade only on a portion of the oscillating saw blade guide surface located generally adjacent the medial half of the long bone while the distal end of the saw blade is extended across the end of the long bone to create at least a portion of at least one resected surface on at least a portion of a lateral half of the long bone without any portion of the oscillating saw blade guide surface** |

| Claims asserted under 35 U.S.C. § 271(a) | Claims asserted under 35 U.S.C. §§ 271(b), (c) |
|---|---|
| **cutting the end of the long bone by supporting a portion of the saw blade only on a portion of the oscillating saw blade guide surface located generally adjacent the medial half of the long bone while the distal end of the saw blade is extended across the end of the long bone to create at least a portion of at least one resected surface on at least a portion of a lateral half of the long bone without any portion of the oscillating saw blade guide surface being located generally adjacent a lateral side of the long bone for supporting the saw blade while the distal end of the saw blade is extended across the end of the long bone**; and<br><br>implanting a total knee arthroplasty implant on the at least one resected surface. | **being located generally adjacent a lateral side of the long bone for supporting the saw blade while the distal end of the saw blade is extended across the end of the long bone**; and<br><br>implanting a total knee arthroplasty implant on the at least one resected surface. |
| | |
| **24.** The method of claim 15 wherein the cutting guide has one of a generally L-shaped configuration or a generally J-shaped configuration with<br><br>a first portion of the configuration positioned generally adjacent a medial side of the long bone, the long bone including a medial compartment including the medial side, a lateral compartment and a center area between the medial compartment and the lateral compartment and | |

| Claims asserted under 35 U.S.C. § 271(a) | Claims asserted under 35 U.S.C. §§ 271(b), (c) |
|---|---|
| a second portion of the configuration positioned generally adjacent an anterior bone surface of the medial compartment of the long bone with no portion of the configuration along and directly anterior of the lateral compartment of the long bone. | |
| | |
| **25.** The method of any of claims 1-6, 13-24 or 7-15 wherein the cutting guide is positioned to mitigate interference with a patella tendon, a patella, or a quadriceps tendon. | |
| | |
| **26.** The method of any of claims 3-6 or 7-14 further comprising allowing for a visual inspection of a portion of the long bone to be cut when viewed through the slot in a mediolateral direction. | |
| | |
| **27.** The method of claim 1 or 2 wherein the cutting guide has one of a generally L-shaped configuration or a generally J-shaped configuration with a first portion of the configuration positioned generally adjacent a medial side of the one of the femur or the tibia of the knee joint, the one of the femur or the tibia including a medial compartment including the medial side, a lateral compartment and a center area between the medial compartment and the lateral compartment, and a second portion of the configuration positioned generally adjacent an anterior bone surface of the medial compartment of the one of the femur or the tibia with no portion of the configuration along and directly anterior of the lateral compartment of the one of the femur or the tibia. | |

**Appendix II: Index of Exhibits to PugetBV's Opening Claim Construction Brief**

| Exhibit | Description |
|---|---|
| 1 | U.S. Patent No. 7,967,822 ('822 patent) (PBV_Stryker_00166130-166196) |
| 2 | Maradit-Kremers, H., *et al.*, Presentation Abstract, *Prevalence of Total Hip (THA) and Total Knee (TKA) Arthroplasty in the United States* (Mar. 11, 2014), 2014 AAOS Annual Meeting (PBV_Stryker_228888-228889) |
| 3 | Excerpts of the '822 prosecution history, including Amendments and Remarks (Dec. 22, 2009) (PBV_Stryker_00082030, 82052-82057) |
| 4 | U.S. Patent No. 5,122,144 (Bert) (PBV_Stryker_00205433-205459) |
| 5 | Excerpt from Stryker's First Supplemental Responses and Objections to PugetBV's First Set of Interrogatories (Dec. 18, 2017) (pages 1-3, 6) |
| 6 | Excerpt from PugetBV's infringement contentions (Oct. 12, 2017) (pages 1-3, Exhibit A) |
| 7 | Excerpts of the '822 reexamination, including Petition for *Inter Partes* Reexamination Table of Contents (PBV_Stryker_00093829-93844); Patent Owner's Response to Second Office Action (Feb. 20, 2014) (PBV_Stryker_00116843-116884); Decision on Appeal (Dec. 16, 2016) (PBV_Stryker_00118715-118726); Decision on Request for Rehearing (June 26, 2017) (PBV_Stryker_00118806-118810); Fed. Cir. Order Dismissing Appeal (Jan. 25, 2018) |
| 8 | *Biomet Orthopedics, LLC v. Puget Bioventures, LLC*, 640 F. App'x 868 (Fed. Cir. Jan. 14, 2016) |
| 9 | Excerpt from PugetBV's Responses to Stryker's Invalidity Contentions (Dec. 22, 2017) (cover page, Exhibit D (pages 1-12)) |
| 10 | U.S. Patent No. 7,344,541 ('541 patent) (PBV_Stryker_00022135-22200) |
| 11 | Dictionary excerpts (PBV_Stryker_00173171-173176; 173186-173194; 231313-231322; 231324-231332) |

| Exhibit | Description |
|---------|-------------|
| 12 | Excerpt from Stryker's Response to PugetBV's infringement contentions (Exhibit A, claim 1) |
| 13 | Excerpt of Woolson (U.S. Patent No. 4,841,975) (PBV_Stryker_00223434-223436, 223438) |
| 14 | Excerpt of Laboureau (FR 2 635 675) (PBV_Stryker_00096976, 96999) |
| 15 | Excerpt of Bosquet (FR 2 664 157) (PBV_Stryker_00224750, 224762) |
| 16 | Excerpt of Protek (F/S Modular Total Knee Replacement System) (PBV_Stryker_00223332, 223347, 223349) |
| 17 | Excerpt of Mark II (Protek) (PBV_Stryker_00224502, 224520) |
| 18 | Tria, A.J. & Scuderi, G.R., *Minimally invasive knee arthroplasty: An overview*, World Journal of Orthopaedics 6(10): 804-811 (Nov. 18, 2015) (PBV_Stryker_00173177-173185) |
| 19 | OrthoInfo, *Minimally Invasive Total Knee Replacement* (PBV_Stryker_00173167-173170) |
| 20 | Excerpt of U.S. Patent No. 7,083,569 (PBV_Stryker_00231411-231438) |
| 21 | Excerpt of U.S. Patent No. 4,548,202 (PBV_Stryker_00231440-231450) |
| 22 | Excerpt of U.S. Patent No. 9,427,267 (PBV_Stryker_00231464-231472) |
| 23 | Excerpt of U.S. Patent No. 9,750,511 (PBV_Stryker_00231474-231485) |
| 24 | Excerpt of U.S. Patent No. 9,861,488 (PBV_Stryker_00231487-231498) |
| 25 | Excerpt of U.S. Patent No. 6,964,071 (PBV_Stryker_00231661-231669) |
| 26 | Excerpt of U.S. Patent No. 9,839,445 (PBV_Stryker_00231550-231590) |
| 27 | Excerpt of U.S. Patent No. 9,662,144 (PBV_Stryker_00231500-231535) |
| 28 | Excerpt of U.S. Patent No. 9,498,360 (PBV_Stryker_00231592-231603) |

| Exhibit | Description |
|---------|-------------|
|         |             |
| 29      | Excerpt of U.S. Patent No. 9,320,630 (PBV_Stryker_00231605-231625) |
| 30      | Slip sheet/certified file history for the '822 patent provided on CD (PBV_Stryker_00080379-93823) |
| 31      | Slip sheet/certified reexamination history for the '822 patent provided on CD (PBV_Stryker_00093824-118832) |